# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CIVIL CASE NO. 5:21-cv-00097-MR

| | | |
|---|---|---|
| OSCAR PEREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| TROY A. MORRISON, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendant Troy A. Morrison's

Motion for Summary Judgment [Doc. 46]. Also pending is the Plaintiff's

"Notice and Plaintiff's Request for Leave to File a Surreply" [Doc. 54].

## I.     BACKGROUND

The incarcerated Plaintiff Oscar Perez, proceeding pro se, is

incarcerated in the North Carolina prison system under the Interstate

Corrections Compact ("ICC"). On June 20, 2021,[1] the Plaintiff filed this

action pursuant to 42 U.S.C. § 1983 addressing incidents that allegedly

_____

[1] The date of prison staff's signature on the mailing envelope is used here [Doc. 1-3 at 2] because the Complaint and cover letter were signed on different dates, and the Plaintiff does not indicate when he placed the Complaint in the prison's mail system. See generally Houston v. Lack, 487 U.S. 266, 275 (1988) (Under the "Prison-Mailbox Rule," a prisoner's pleading is filed with the court as of the date that the prisoner placed the pleading in the prison system's outgoing mail to the court).

occurred at the Alexander Correctional Institution.[2] [See Doc. 1: Complaint]. The Plaintiff's unverified Complaint[3] passed initial review against Defendant Troy A. Morrison for retaliation and due process violations,[4] the remaining claims were dismissed without prejudice, and Plaintiff was granted the opportunity to amend. [Doc. 12: Order on Initial Review]. The Plaintiff's unverified Amended Complaint[5] passed initial review of the same claims.[6] [Doc. 20: Am. Compl.; Doc. 25: Order on Initial Review of Am. Compl.]. The Plaintiff seeks a declaratory judgment; injunctive relief; compensatory, nominal, and punitive damages; and a jury trial. [Doc. 20: Am. Compl. at 15].

Defendant Morrison filed the instant Motion for Summary Judgment. [Doc. 46: MSJ]. Thereafter, the Court entered an Order in accordance with

---

[2] The Plaintiff is presently incarcerated at the Tabor Correctional Institution.

[3] The Complaint is "affirm[ed]," but it is not verified under penalty of perjury pursuant to 28 U.S.C § 1746. [Doc. 1: Complaint at 11 ("Affirmation of Plaintiff")].

[4] The Plaintiff's due process claims that Defendant Morrison imposed security risk group ("SRG") restrictions on him and placed him on restricted housing for 51 days passed initial review. [Doc. 12: Order on Initial Review at 6]. The Plaintiff's other due process claims were dismissed. [Id.].

[5] See [Doc. 20: Am. Compl. at 16 ("Affirmation of Plaintiff")]; note 3, *supra.*

[6] The Plaintiff filed a Motion to Dismiss the due process claims relating to restrictive housing, which the Court granted. [Doc. 40: Plaintiff's MTD; Doc. 43: Order]. Accordingly, the only due process claim that is still pending relates to the Plaintiff's SRG restrictions.

2

Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising the Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 48: Roseboro Order]. The Plaintiff filed a Response [Doc. 52: MSJ Response],[7] and the Defendant filed a Reply [Doc. 53: MSJ Reply]. Thereafter, the Plaintiff filed a motion seeking leave to file a surreply. [Doc. 54].

This matter is ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings,

---

[7] The Plaintiff's Response is unverified, but he has attached several verified declarations (including his own) and other materials to the Response.

3

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, only evidence admissible at trial may be considered by the Court on summary judgment. Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citation omitted).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable

to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

<u>Scott</u>, 550 U.S. at 380.

## III.   FACTUAL BACKGROUND

The parties' forecasts of evidence show the following, which is undisputed except as otherwise noted.

The Plaintiff was convicted in Indiana of first degree murder, criminal gang activity, and attempted murder in 2006; and of prisoner possession of dangerous device/material in 2011.  [See Doc. 47-1: MSJ Ex at 6-8 (Indiana DOC Offender Data); Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 3)].  The Plaintiff was active with the Nortenos gang before 2006. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 3); Doc. 47-2: Morrison Decl. at ¶ 16].  The Plaintiff renounced his gang affiliation in 2014 after one of his brothers was murdered by Nortenos.  [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 4); Doc. 52-2: Response Ex at 17 (Juarez[8] Decl.)].  He is not presently a gang member.  [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 26)].

The Plaintiff was transferred to the North Carolina prison system in February 2020 pursuant to the ICC.  [See id at 9 (North Carolina DPS OPUS Offender Information Screen); Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 5)]. The Plaintiff was processed at Central Prison on February 21, 2020. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 5)]. The Plaintiff's tattoos were recorded upon processing, including "Perez" on his back.  [Doc. 47-1: MSJ Ex. at 53 (Offender Information Screen)]. The Security Risk Group ("SRG") unit at Central Prison did not associate the

---

[8] Antelmo Juarez, one of Plaintiff's brothers, is incarcerated in Indiana.

Plaintiff with any gang. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 5)]. The Plaintiff was transferred to Alexander CI in April 2020. [Id at ¶ 6].

Officer Morrison, an SRG intelligence officer at Alexander CI, began hearing in early 2021 that the Plaintiff was smuggling drugs into the facility and distributing them.[9] [Doc. 47-2: Morrison Decl. at ¶¶ 3, 6]. Shortly thereafter, on April 5, 2021, an assault occurred in the Plaintiff's housing pod between two other inmates. [Id. at ¶ 7]. Officer Morrison learned through confidential interviews[10] that the Plaintiff was distributing K2, a type of synthetic marijuana, and that one of the Plaintiff's drug transactions led to the April 5 assault. [Id.]. The SRG unit opened an investigation into the Plaintiff based on that information. [Id. at ¶ 8; see Doc. 47-1: MSJ Ex at 130].

The Plaintiff was placed in RHAP starting on April 6, 2021 so that the intelligence unit could complete its investigation; this was approved by Sergeant Massagee. [Doc. 47-2: Morrison Decl. at ¶¶ 8, 17-18; Doc. 47-1: MSJ Ex at 130 (Policy and Procedure O.0101(4) (RHAP is authorized "to

---

[9] According to the Plaintiff, Defendant Morrison was getting "bad intelligence" and has never been able to substantiate these accusations. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 26)].

[10] Defendant Morrison has not disclosed the names of the individual inmates who provided information about the Plaintiff for their safety, especially given the Plaintiff's violent past and gang ties. [Doc. 53: MSJ Reply at 3].

provide necessary control while completing an investigation….”), O.0102 (addressing the initial 72-hour stay in RHAP and subsequent approval procedures)].

The Plaintiff was interviewed by the SRG intelligence unit[11] on April 6, 2021. [Doc. 47-2: Morrison Decl. at ¶ 9]. During the interview, the Plaintiff was asked to remove his shirt and officers took pictures of his tattoos, including "Perez 14" on his back, which is associated with the Nortenos gang.[12] [Id.]. Based on information in the North Carolina prisons' OPUS computer system at that time, Officer Morrison thought that the Plaintiff had added "14" to his back while he was incarcerated in North Carolina.[13] [Id. at ¶ 10; Doc. 47-1: MSJ Ext at 49-50 (Offender Information Screen)]. Officer Morrison told the Plaintiff that he could get SRG Level 3 restrictions, and the Plaintiff verbally complained that those restrictions cannot be imposed on him because he is an Indiana inmate. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 11)]. SRG officers became frustrated with the

_____

[11] At that time, the intelligence unit consisted of Officer Morrison, Captain Russell, and Officer Daniel Turner. [Doc. 47-2 at ¶ 3].

[12] The number 14 is commonly used by Nortenos because it symbolizes the 14th letter of the alphabet, N. [Doc. 47-2: Morrison Decl. at ¶ 9].

[13] Officer Morrison later learned additional information and he now believes that the Plaintiff received the "14" tattoo prior to his incarceration in North Carolina. [Doc. 47-2: Morrison Decl. at ¶ 10].

Plaintiff during the interview because he did not have a lot of information to give them.[14]  [Id. at ¶ 10].  Officer Morrison took the Plaintiff to RHAP after the interview.  [Id.; Doc. 47-2: Morrison Decl. at ¶ 8].  "SRG" told another inmate on April 6 that they locked up the Plaintiff because he "got smart" with them. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 12); Doc. 52-2: Response Ex at 12 (Prudente Decl.)].

The Plaintiff's cell and personal property were searched and inventoried by staff between April 6 and 12.  [Doc. 47-2: Morrison Decl. at ¶ 11].  The Plaintiff's property included "My Life Story" that described how the Plaintiff became a Nortenos gang member by assaulting someone, and a piece of paper with "Nortenos" written on it.  [Id.; see Doc. 47-1: MSJ Ex at 41-44 (My Life Story); Doc. 47-1: MSJ Ex at 45 ("Nortenos")]. The Plaintiff's mail was monitored for gang-related and drug-related activity as part of the investigation.  [Doc. 47-2: Morrison Decl. at ¶ 14; Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 13 describing more than 30 pieces of delayed

---

[14] According to Officer Morrison, it is common for offenders to refuse to talk with the intelligence unit about incidents such as assaults, and this does not offend or upset him. [Doc. 47-2: Morrison Decl. at ¶ 20]. He denies that any of his actions were taken in retaliation for anything the Plaintiff said or refused to say, that he has any ill will towards the Plaintiff, or that he wanted to harm him. [Doc. 47-2: Morrison Decl. at ¶¶ 20-21]. All of Officer Morrison states that all of his actions were taken in furtherance of the investigation into the Plaintiff's drug and gang activities because the Plaintiff was believed to be a drug distributor [Id. at ¶ 20].

mail, missing mail, and mail that was opened and re-sealed)].   The Plaintiff's mail included several items that suggested gang activity.[15]   [See Doc. 47-1: MSJ Ex at 38-40 (letter to Plaintiff's mother); Doc. 47-1: MSJ Ex at 48 (letter to Plaintiff from his brother); Doc. 47-1: MSJ Ex at 50 (artwork)].

On April 9, 2021, the Plaintiff's stay in RHAP was extended by Lieutenant Quinn and Unit Manager Biecker.  [Doc. 47-2: Morrison Decl. at ¶ 18; Doc. 47-1: MSJ Ex at 81 (Inmate Control Status Report reflecting Lt. Quinn's request for a 12-day RHAP extension on April 9, 2021)].

On April 12, 2021, Officer Morrison gave a written statement that he believed the Plaintiff to be a member of the Nortenos SRG, and designated the Plaintiff an SRG associate. [Doc. 47-2: Morrison Decl. at ¶¶ 12, 13]. The SRG associate designation applies to "any offender or other person who, though not validated as a Security Risk Group Member, is known to participate or support the illegal or illicit activities of an SRG" or to "any offender that is being watched or observed to gather evidence or intelligence to support validation as an SRG member."   [Id. at ¶ 13].

---

[15] The Plaintiff asserts that these documents are innocent and/or should not be attributed to him. [Doc. 52-2: Response Ex at 16 (Padilla Decl.); id. at 17 (Suarez Decl.); id. at 19 (Virgen Decl.)].

Because SRG associates are not yet validated, none of the custody restrictions associated with SRG validation apply to them. [Id.].

The Plaintiff began attempting to file grievances on April 12, 2021 against Defendant Morrison and the SRG unit. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶¶ 14, 24); see id. at 13 (Allison Decl., stating that he witnessed the Plaintiff submitting grievance forms on April 12, 16, 19, and 22, and May 3, 2021)]. The Plaintiff was finally able to file a grievance on May 5, 2021, his fifth attempt to do so.[16] [Id. at 3 (Plaintiff's Decl. at ¶ 25)]. In the May 5 grievance, he states:

> On 4-6-21 I had a conversation with SRG. I invoked my rights under the ICC. I've also wrote multiple request still invoking my rights. SRG did not like my complaints and content of my protected speech. As a result of my protected speech, SRG has retaliated against me. By the following actions: They confiscated my legal mail, legal materials, all my cases for (7) days. While I had ongoing pending cases. They confiscated attorney client privileged content. Without providing a DC-160 of what they actually took. Mr. Morrison wrote me up on my legal contents that he had no right to read copy or report. Mr. Morrison lied that I admitted that I was a gang member. When I have physical, documentary proof that I'm not. SRG is getting my mail forwarded to them. I have not received any notice of these delays in writing. Some delays are for 17-18 days. Some mail never shows up. All of these actions constitute an ongoing incident of retaliation. For exercising my freedom of speech and right to petition the government for redress of grievances. In invoking my rights under the ICC….

---

[16] The grievance is dated May 4, 2021.

[Doc. 47-1: MSJ Ex at 133] (errors uncorrected). The Plaintiff received a Step One Response on May 17, 2021, stating that Officer Morrison was not retaliating against him.[17] [Id. at 134]. The Plaintiff's Step Two and Step Three appeals were denied. [Id. at 132, 135].

On April 13, 2021, the Plaintiff wrote a letter to Larry Williamson of the Western Region Office, complaining that he is in RHAP under investigation, that he was not responsible for the assault, and he is in the "hole" for his own protection because the inmate assault was perpetrated by a "blood." [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 14); see Doc. 47-1: MSJ Ex at 136 (April 13, 2021 letter)].

On April 21, 2021, the Plaintiff attempted to obtain a temporary restraining order from an Indiana federal court to stop the SRG unit from retaliating against him. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 24); see Doc. 53-1: Reply Ex at 1-8 (Plaintiff's Motion Requesting a Temporary Restraining Order dated April 21, 2021 and docketed in the Southern District of Indiana on April 26, 2021)].

---

[17] The Plaintiff's Declaration refers to a response by "Mr. Morrison" on May 17, 2021. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 25)]. However, the May 17, 2021 Step One grievance response was signed by Chris M. Biecker, and not Officer Morrison. [Doc. 52-2: Response Ex at 36].

On April 21, 2021, the Plaintiff was charged with an A14 disciplinary infraction for SRG activity, based on Officer Morrison's April 12 written statement. [Doc. 47-2: Morrison Decl. at ¶ 12; Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 16); see Doc. 47-1: MSJ Ex at 69 (4/21/21 Notice to Offender regarding disciplinary procedures, signed by Plaintiff and Sergeant Thomas. R. Huffman); Doc. 47-1: MSJ Ex at 65-67 (Investigating Officer's Report by Sgt. Huffman)]. That same day, the Facility Classification Committee ("FCC") approved extending the Plaintiff's RHAP for another 45 days, for a total of 60 days, until the disciplinary charge could be resolved. [Doc. 47-2: Morrison Decl. at ¶ 18; Doc. 47-1: MSJ Ex at 77-78 (4/20/21 45 continuation of RHAP pending FIO investigation, approved by the FCC)].

On May 25, 2021, the Plaintiff's A14 disciplinary charge came before a disciplinary hearing officer ("DHO"). [Doc. 47-2: Morrison Decl. at ¶ 19; Doc. 47-1: MSJ Ex at 14 (Offense and Disciplinary Report); id. at 18 (Record of Hearing)]. The DHO dismissed the disciplinary charge on the grounds that the "My Life Story" document was legal material from his Indiana Case and the "Perez 14" tattoo existed before he entered North Carolina. [Doc. 47-2: Morrison Decl. at ¶ 19; Doc. 47-1: MSJ Ex at 18 (Record of Hearing)]. The DHO did not consider gang-related items that

were found in the Plaintiff's mail during the investigation because those items were found to have occurred outside the timeframe of the original investigation. [Doc. 47-2: Morrison Decl. at ¶ 19; Doc. 47-1: MSJ Ex at 14 (Offense and Disciplinary Report); Doc. 47-1: MSJ Ex at 18 (Record of Hearing)]. The Plaintiff was released from RHAP on May 26, 2021, the day after his disciplinary charge was dismissed. [Doc. 47-2: Morrison Decl. at ¶ 19].

## IV. DISCUSSION

### A. Due Process

To prevail on a procedural due process claim, an inmate must first demonstrate that he was deprived of "life, liberty, or property" by governmental action. <u>Bevrati v. Smith</u>, 120 F.3d 500, 502 (4th Cir. 1997). Although prisoners are afforded some due process rights while incarcerated, those liberty interests are limited to "the freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995). Moreover, changes "in a prisoner's location, variations of daily routine, changes in conditions of confinement (including

administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison."  Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991); Slezak v. Evatt, 21 F.3d 590, 594 (4th Cir. 1994) ("The federal constitution itself vests no liberty interest in inmates in retaining or receiving any particular security or custody status '[a]s long as the [challenged] conditions or degree of confinement ... is within the sentence imposed ... and is not otherwise violative of the Constitution.'") (quoting Hewitt v. Helms, 459 U.S. 460, 468 (1983)).

The Plaintiff claims that Defendant Morrison violated his due process rights by making him an SRG associate.  [See Doc. 20: Am. Compl. at 5, 7].  Defendant Morrison has forecast evidence that the SRG associate label is merely a security classification that carries no custody restrictions.  [See Doc. 47-2: Morrison Decl. at ¶ 13].  The Plaintiff has not forecast any evidence that the SRG associate classification imposed atypical and significant hardships on him in relation to the ordinary incidents of prison life.  The Plaintiff has thus failed to demonstrate the existence of a genuine dispute of material fact that the Plaintiff had a protected liberty interest with regard to the SRG associate label, or that he was deprived of any required process before that label was imposed.  Accordingly, the Defendant's

Motion for Summary Judgment on the Plaintiff's due process claim is granted.

The Plaintiff's due process claim is also unexhausted. The Prison Litigation Reform Act (PLRA) requires a prisoner to exhaust his administrative remedies before filing a § 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. 534 U.S. 516, 532 (2002). The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action to further the efficient administration of justice. Id.

In Woodford v. Ngo, the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law ... requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the

16

agency addresses the issues on the merits).'"   548 U.S. 81, 90 (2006) (quoting <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1024 (7th Cir. 2002)). Further, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." <u>Jones v. Bock</u>, 549 U.S. 199, 211 (2007) (citing <u>Porter</u>, 534 U.S. at 524).  Because failure to exhaust administrative remedies is an affirmative defense, defendants have the burden of pleading and proving lack of exhaustion.  <u>Id.</u> at 216.

The North Carolina Department of Adult Corrections (NCDAC)[18] has established a three-step procedure governing submission and review of inmate grievances in its Administrative Remedies Procedures (ARP). <u>Moore v. Bennette</u>, 517 F.3d 717, 721 (4th  Cir. 2008).  Inmates are required to "properly" exhaust administrative remedies in accordance with ARP.  <u>Woodford</u>, 548 U.S. at 90; <u>Moore</u>, 517 F.3d at 726.  An inmate does not exhaust his administrative remedies with the NCDAC until he completes all three steps of the ARP.  <u>Moore</u>, 517 F.3d at 726.

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies. <u>Jones</u>, 549 U.S. at 216. Once a defendant presents evidence of a failure to exhaust, the burden of proof

---

[18] Previously known as the North Carolina Department of Public Safety (NCDPS).

shifts to the inmate to show, by a preponderance of the evidence, either that exhaustion occurred or that administrative remedies were unavailable. Graham v. Gentry, 413 F. App'x 660, 663 (4th Cir. 2011).

Here, Defendant Morrison asserts that the Plaintiff failed to exhaust his administrative remedies because the May 5 grievance addresses only retaliation, and not any alleged due process violation. [See Doc. 47: MSJ Memo at 20-21]. The record clearly shows that the May 5 grievance did not fairly present to the prisons any due process claim against Defendant Morrison. See Moore, 517 F.3d at 729; Davidson v. Davis, No. 3:13-cv-590-FDW, 2015 WL 996629, at *3 (W.D.N.C. March 6, 2015). To the extent that the Plaintiff suggests that his lack of exhaustion should be excused because of the numerous failed attempts to file grievances, this fails because he has only forecast evidence that he repeatedly attempted to file the same grievance that was ultimately processed on May 5, and which includes only a retaliation claim. [See Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶ 26) (stating that, "[o]n May 5, 2021, I was finally able to file *my grievance* against Mr. Morrison….")]. The Plaintiff has failed to demonstrate that he attempted to file a grievance that fairly presented his due process claim, and that an administrative remedy was unavailable to him. Accordingly, the Defendant is alternatively granted summary

judgment on the Plaintiff's due process claim for failure to exhaust the available administrative remedies.

### B. Retaliation

The First Amendment right to free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for exercising that right." Suarez Corp. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). Prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir. 1978). In order to state a colorable retaliation claim under § 1983, a plaintiff must allege: "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) (citing Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017); quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005)). The "same-decision test" applies to determining the causation element of a prisoner's retaliation claim. Id. Once the prisoner-plaintiff shows that his "protected conduct was a substantial motivating factor in a prison guard's decision to take adverse action," the burden then shifts to the defendant to prove a

19

permissible basis for taking that action.  Id. at 300.  For a plaintiff to meet his prima facie burden of causation, he must show "(1) that the defendant was aware of [his] engaging in protected activity" and (2) "some degree of temporal proximity to suggest a causal connection."  Shaw v. Foreman, 59 F.4th 121, 130-31 (4th Cir. 2023) (quoting Constantine, 411 F.3d at 501).  Bare or conclusory assertions of retaliation are insufficient to establish a retaliation claim.  Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994).  In the prison context, retaliation claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct."  Id.

The Plaintiff claims that Defendant Morrison sent him to restrictive housing, interfered with his mail and publications, confiscated his personal property and legal documents, classified him as an SRG associate, and wrote him up on a false disciplinary charge in retaliation for "verbally invoking his rights, writing requests, filing grievances, and filing litigation." [Doc. 20: Am. Compl. at 7].

The Plaintiff has forecast evidence that a prison official told another inmate that the Plaintiff was locked up because he "got smart" with officers [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶¶ 10, 12); Doc. 52-2: Response Ex at 12 (Prudente Decl.)]; that he was retaliated against for

verbally complaining about potential SRG restrictions during the April 6 interview [id. at ¶¶ 10, 27]; and that the Plaintiff was retaliated against for filing grievances beginning on April 12, 2021 [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at ¶¶ 25, 27)]. However, the Plaintiff has failed to demonstrate that a genuine dispute of material fact exists with regard to causation. Only admissible evidence can be considered on summary judgment, and this forecast by the Plaintiff consists only of inadmissible hearsay and conjecture.

Defendant Morrison has forecast evidence, which the Plaintiff does not dispute, that the SRG investigation was opened *before* the April 6 interview because the SRG unit had received information in early 2021 that the Plaintiff was distributing drugs, and because confidential sources reported that the Plaintiff was involved in the April 5 incident. The Plaintiff was interviewed on April 6; his property was searched and his mail was monitored as part of the investigation; and the Plaintiff was placed on RHAP during the investigation with the approval of Sergeant Massagee in accordance with prison policy. [Doc. 47-2: Morrison Decl. at ¶¶ 8, 14-15, 18]. That the Defendant merely followed through with the investigation that was initiated before any of the allegedly protected activity occurred fails to demonstrate the existence of a genuine dispute of material fact regarding

causation. See Wagner v. Wheeler, 13 F.3d 86, 91 (4th Cir. 1993) (generally, the mere temporal proximity between a protected activity and an allegedly retaliatory action "is simply too slender a reed on which to rest a Section 1983 retaliation claim"); see, e.g., Locke v. Solomon, No. 3:17-cv-337-FDW, 2018 WL 1950444 (W.D.N.C. April 25, 2018) (granting judgment on the pleadings on a retaliation claim where the defendant merely followed through on his pre-grievance decision to recommend an STG classification, after a grievance was filed); Edwards v. Buchanan, No. 1:19-cv-110-MR, 2022 WL 526237, at *4 (W.D.N.C. Feb. 22, 2022) (granting summary judgment on plaintiff's claim that an SRG associate designation was retaliatory where the validation process was already underway when the allegedly protected conduct occurred).

Insofar as the Plaintiff suggests that Defendant Morrison retaliated against him by keeping him in RHAP for 60 days, he has failed to forecast any evidence in this regard. Instead, the forecast evidence demonstrates that all of the RHAP extensions were approved by prison officials other than Defendant Morrison. [Doc. 47-2: Morrison Decl. at ¶ 18; Doc. 47-1: MSJ Ex at 81 (Inmate Control Status Report reflecting Lt. Quinn's request for a 12-day RHAP extension on April 9, 2021); Doc. 47-2: Morrison Decl.

at ¶ 18; Doc. 47-1: MSJ Ex at 77-78 (4/20/21 45 continuation of RHAP pending FIO investigation, approved by the FCC)].

Further, the Plaintiff has not forecast any evidence that Defendant Morrison retaliated against him for filing grievances. The Plaintiff's vague and conclusory statement that he "should not be retaliated against for … filing grievances" is insufficient. [Doc. 52-2: Response Ex at 3 (Plaintiff's Decl. at § 27)]; see Adams, 40 F.3d 72, 74. The forecast of evidence demonstrates that Defendant Morrison designated the Plaintiff as an SRG associate and provided a written statement that he believed the Plaintiff to be a member of the Nortenos SRG on April 12, 2021. [Doc. 47-2: Morrison Decl. at ¶¶ 12, 13]. The Plaintiff has forecast evidence that he began attempting to file his grievances on April 12. As such, Plaintiff's forecast demonstrates that the Plaintiff's grievance attempts began *after*, and in response to, Defendant Morrison's adverse actions that day. [See Doc. 47-1: MSJ Ex at 133 (claiming that Morrison "wrote [him] up" in retaliation for claiming his rights under the ICC)]. The Plaintiff has not forecast any evidence that Defendant Morrison retaliated against him for attempting to file grievances, or that Defendant Morrison even knew about the Plaintiff's grievance attempt when he made his written statement and labeled the Plaintiff as an SRG associate. The Plaintiff has thus failed to forecast

evidence that Defendant Morrison took any adverse action against him for filing grievances.  See Adams, 40 F.3d at 74.

Accordingly, Defendant Morrison will be granted summary judgment on the Plaintiff's retaliation claims.

### C.    Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law."  Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Here, because the Plaintiff has not forecasted evidence that the Defendant violated a constitutional right, the Defendant is also entitled

qualified immunity. Defendant Morrison is, therefore, entitled to summary judgment on this ground as well.

### D. Motion for Leave to File Surreply

The Plaintiff seeks leave to file a surreply to respond to the Defendants' argument that the Plaintiff's claims about the mail have been dismissed, and should not be considered on summary judgment.[19] [Doc. 54]. While acknowledging that his First Amendment claims about interference with the mail were dismissed on initial review, the Plaintiff seeks leave to argue that his mail-related retaliation claims remain pending and should be considered. [Id. at 3].

Nothing in the Court's standard Pretrial Order and Case Management Plan authorizes the filing of a surreply brief. The Local Rules provide that such briefs "are neither anticipated nor allowed by this Rule, but leave of Court may be sought to file a surreply when warranted." LCvR 7.1(e). "Generally, courts allow a party to file a surreply only when fairness dictates based on new arguments raised in the previous reply." DiPaulo v. Potter, 733 F. Supp. 2d 666, 670 (M.D.N.C. 2010). The Court does not find that

---

[19] The Plaintiff also claims that he has not received a copy of the Defendants' Reply. [Doc. 53]. A copy of the Reply was mailed to him as a courtesy on August 4, 2023.

fairness so dictates here and, accordingly, the Plaintiff's request for leave to file a surreply is denied.

## IV.    CONCLUSION

For the reasons stated herein, the Court grants Defendant's Motion for Summary Judgment, and this action is dismissed with prejudice.

### ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment [Doc. 46] is **GRANTED**, and this action is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Plaintiff's "Notice and Plaintiff's Request for Leave to File a Surreply" [Doc. 54] is construed as a Motion for Leave to File a Surreply and is **DENIED**.

**IT IS SO ORDERED.**

Signed: September 5, 2023

Martin Reidinger
Chief United States District Judge